**SO ORDERED.**

**SIGNED this 04 day of April, 2011.**



Designated for on-line use but n   ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re:<br><br>EARL EMERSON WARNE,<br><br>                      DEBTOR. | CASE NO. 09-13941<br>CHAPTER 13 |

### MEMORANDUM OPINION
### GRANTING DAKOTA FINANCIAL, L.L.C.'S MOTION TO
### COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT

The matter before the Court is the Motion to Compel Assumption or Rejection of Executory Contract (hereafter "Motion") filed by Dakota Financial, L.L.C. (hereafter "Dakota").[1] Prepetition Debtor, as lessee, and Dakota, as lessor, entered into an Equipment Lease Agreement for Debtor's use of a 2007 Volvo semi-tractor for 61 months (hereafter "Agreement"). Payments under the Agreement were in default when Debtor filed for relief under Chapter 13. Dakota

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(a) and (o). There is no objection to venue or jurisdiction over the parties.

requests that the Court determine that the Agreement is a true lease and requests the Court to fix a reasonable time for Debtor to assume or reject and, if Debtor rejects, to grant relief from stay. Debtor opposes the Motion, asserting that because the Agreement should be re-characterized as a secured sale, he should be permitted to remain in possession of the semi-tractor while making payment in full of Dakota's secured claim through his Chapter 13 plan.

The issue of whether the Agreement is a true lease was submitted for decision on stipulations of fact and briefs. The Court, having carefully considered the stipulated facts, reviewed the Agreement, and studied the authorities submitted, is now ready to rule.

**FINDINGS OF FACT.**

The Court makes the following findings of fact based upon the stipulation and review of the Agreement (filed with the stipulation) and the Payment Schedule Addendum (filed with the Debtor's brief).

In August 2008, Debtor and Dakota executed an Equipment Lease Agreement, lease # 2473, pursuant to which Debtor leased a 2007 Volvo, VNL64T880, VIN # ***482257 (hereafter "Semi-tractor). The Semi-tractor was at all times owned by Dakota. The Agreement states it is to be interpreted under California law and in paragraph 1, states, "It is the intent of Lessor and Lessee that this Lease is a true lease and not a lease intended as security pursuant to Cal. Com. Code Section 1201(36)." Debtor was required to make an initial rental payment of $20,000 and 60 rental payments of $2,185, due on the first day of every month. Pursuant to paragraph 5 of the Agreement, Debtor also paid a security deposit of $31,100 upon execution of the Agreement. The present value of the lease payments, excluding the security deposit, does not equal or exceed

the purchase price of the Semi-tractor. The signature page of the Agreement states in bold face, large type that "THIS LEASE IS NON-CANCELLABLE . . .."[2]

The Debtor assumed the risk of loss of the tractor. Paragraph 11 of the Agreement, entitled "Risk of Loss," states, "Lessee shall bear the entire risk of loss, theft, destruction, damage or disrepair of the Equipment or any part thereof for any cause whatsoever." The transfer of this risk to the Debtor is reinforced by paragraph 7 of the Agreement, which states, " Lessee bears all risk that the Equipment may become unusable for any reason . . .. Debtor also agreed to pay taxes,[3] insurance,[4] license and registration fees,[5] and all service or maintenance costs. [6]

The $31,100 security deposit is available to Dakota to secure payment "for potential damages or excessive wear" to the Semi-tractor.[7] If Debtor performs every obligation under the Agreement, the security deposit, or so much of it as has not been applied by Dakota, shall be returned to the Debtor.

---

[2] Agreement, p. 8, Dkt. 74-1, p. 8. Paragraph 2 of the Agreement provides for cancellation by the Debtor as an alternative remedy if "for any reason the Equipment has not been delivered, installed and accepted by Lessee within ninety (90) days after it is ordered by the Lessor, or if Lessee fails to accept the Equipment and execute a Delivery Receipt and Acceptance Certificate within 14 days following the delivery of the Equipment." Since the Semi-tractor was accepted by the Debtor, this right of cancellation is not relevant to this controversy. The Court therefore disregards the stipulation that Debtor does *not* contend that the subject lease is *not* subject to termination by the Debtor. *See* Dkt. 74, ¶ 12.

[3] Agreement ¶ 12, Dkt. 74-1, p. 4.

[4] Agreement ¶ 10, Dkt. 74-1, pp. 3- 4.

[5] Agreement ¶ 12, Dkt. 74-1, p. 4.

[6] Agreement ¶ 9, Dkt. 74-1, p. 3.

[7] Agreement ¶ 5, Dkt. 74-1, p. 2.

Debtor is not required to renew the Agreement at the end of the term and does not have an option to do so. At the end of the term, the Semi-tractor shall be returned to Dakota, unless Debtor exercises the purchase option. As to return, the Agreement, paragraph 13 states, "Upon the expiration or earlier cancellation or termination of this Lease, Lessee shall, at Lessee's sole cost, expense and risk promptly return the Equipment by delivering it, pack and ready for shipment, to such place or carrier as Lessor may specify in good condition as received, less reasonable wear and tear." As to Debtor's purchase option, the Agreement, paragraph 19, states, "Provided that the Lease has not been terminated or cancelled and that no default or Event of Default has occurred and is continuing, on the last day of the Term, Lessee shall have the option of to purchase the Equipment for a price equal to the following 'Purchase Option Price': $31,100. Lessor and Lessee acknowledge and agree that such price represents the estimated fair market value of the Equipment as of the date of the Lease."

There is no evidence that the rental payments required by the Agreement were excessive as compared to typical lease payments. Debtor contends the residual value of the subject Semi-tractor after expiration of the lease term will be between $20,000 and $40,000. There is no evidence that the Debtor was required to pay a substantial, nonrefundable security deposit.

Debtor filed for relief under Chapter 13 on November 30, 2009. Dakota is listed on Debtor's schedules as a secured creditor with a lien on the Semi-tractor. Debtor's proposed plan treats Dakota's claim under the Agreement as a secured claim up to the

4

value of the Semi-tractor. Through the Motion, Dakota objects to this treatment of its claim, contending that the Agreement is a true lease which Debtor should be compelled to assume or reject.

**ANALYSIS.**

  **A. The Equipment Lease Agreement is a true lease.**

  Much ink has been spilt over the intriguing question of what is a true lease. This Court recently examined the significant distinctions between a true lease and a security agreement in *HP Distribution, LLP*.[8] This opinion will not be prolonged by re-plowing that ground.

  Determination of the question whether the August 2008 Equipment Lease Agreement is a true lease requires the Court to apply §1-203 of the UCC, the relevant portions of which have been adopted without amendment in California.[9] As the party contending that the Agreement is not what it purports to be, the Debtor has the burden of proof.[10] An often cited law review article states the following as the guiding principles of the UCC amendments distinguishing leases from security interests that were initially codified in UCC § 1-201(37) and are now found in UCC § 1-203:

> The important principle recognized in amended section
> 1-201(37) is that lessors under a true lease are economic

---

[8] *Hitchin Post Steak Co. v. General Electric Capital Corp. (In re HP Distribution, LLP)*, 436 B.R. 679 (Bankr. D. Kan. 2010).

[9] Cal. Com. Code § 1203.

[10] *In re HP Distribution, LLP*, 436 B.R. at 682.

5

investors possessing a real economic stake in the residual
value of the leased goods. . . .The original agreement in a true
lease cannot contain an economically irresistible option,
which the parties expect from the outset will be exercised by
the lessee to purchase the goods or renew the lease for the
remaining economic life of the goods. *To have a true lease,
the original agreement must leave the lessor with some
meaningful economic interest in the residual.*[11]

Under the UCC § 1-203(a), "[w]hether transaction in the form of a lease creates a lease or a security interest is determined by the facts of each case." Subsection (b) sets forth a "bright line" test of when a transaction in the form of a lease creates a security interest as a matter of law based upon the terms of the transaction. If the agreement in issue does not create a security interest *per se* under the bright line test, the Court then considers the "facts of each case" to determine if an economically meaningful interest was reserved to the lessor at the end of the lease term.[12]

### *The Bright-Line Test*

The parties agree that the bright line test is not satisfied. As stated in U.C.C. § 1-203(b), the test is as follows:

> (b) A transaction in the form of a lease creates a security
> interest if the consideration that the lessee is to pay the lessor
> for the right to possession and use of the goods is an
> obligation for the term of the lease and is not subject to
> termination by the lessee, and:

---

[11] Edwin E. Huddleson, III, Old Wine in New Bottles: UCC Article 2A-Leases, 39 Ala. L. Rev. 615, 632 (1988) (Emphasis added).

[12] *Id*. at 625.

> (1) The original term of the lease is equal to or greater than
> the remaining economic life of the goods;
>
> (2) the lessee is bound to renew the lease for the remaining
> economic life of the goods or is bound to become the owner
> of the goods;
>
> (3) the lessee has an option to renew the lease for the
> remaining economic life of the goods for no additional
> consideration or for nominal additional consideration upon
> compliance with the lease agreement; or
>
> (4) the lessee has an option to become the owner of the goods
> for no additional consideration or for nominal additional
> consideration upon compliance with the lease agreement. [13]

The Court agrees with the parties that the facts of this case do not satisfy the bright line test. The test requires that the agreement cannot be terminated by the lessee and one of four other elements be present. As to termination, the Agreement expressly states on the signature page, in bold face large capitals, "THIS LEASE IS NON-CANCELLABLE . . . ." [14] Therefore, the initial requirement is present.

The first three of the four alternative additional requirements clearly are not present. The original term of the lease is approximately five years. Debtor provides no direct evidence as to the remaining economic life of the Semi-tractor. However, based upon the Debtor's stipulation that the Semi-tractor will have a residual value between $20,000 and $40,000 at the end of the lease term, the Court finds that the economic life of the Semi-tractor exceeds the lease term. Debtor is not bound to renew the lease, and the

---

[13] UCC § 1-203(b).

[14] Agreement, p. 8, Dkt. 74-1, p. 8.

7

Debtor does not have an option to renew the lease for the remaining economic life of the goods.

The fourth additional factor also is not satisfied. It asks whether the Debtor has an option to become the owner of the goods (1) for no additional consideration or (2) for nominal consideration. The agreement provides that Debtor may purchase the Semi-tractor at the end of the term by the payment of $31,100. Although Debtor has stipulated that he "does not have the option to become the owner . . . for no additional consideration upon completion of the lease agreement,"[15] in his arguments he appears to assert that by applying the security deposit he could acquire the Semi-tractor for no additional consideration. Since the $31,100 option price is equal to the security deposit paid by Debtor at the inception of the lease, Debtor suggests that no additional consideration would be required to exercise the option. The Court rejects this argument. The Agreement[16] specifies the expenses which are covered by the security deposit, and such expenses do not include the exercise of the purchase option. The Agreement provides for the payment of $31,100 additional consideration. Further, the full $31,100 security deposit would be available to apply to the option price only if at the end of the term no other expenses are deductible from the deposit, an event which Debtor has not shown to be likely. The Court concludes that additional consideration is required to exercise the purchase option.

---

[15] Dkt. 74, ¶ 18.

[16] Agreement ¶ 5, Dkt. 84-1, p. 2.

8

The Court also finds the purchase price of $31,100 is not nominal. UCC § 1-201(37)(d)(i) provides that additional consideration is *not* nominal "when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed." Here the parties have stipulated that the option "price represents the estimated fair market value of the Equipment as of the date of the Lease."[17] The fourth alternative of the bright line test is not satisfied.

### *The Economic Realities Test*

Because the Court cannot conclusively presume that the Agreement is a security interest after applying the bright-line test, it must consider the economic realities of the transaction to determine if the Agreement is a true lease. The fundamental question is "whether the lessor retains a 'meaningful reversionary interest' in the property."[18] The inquiry looks beyond the form of the Agreement and examines the nature and extent of the reversionary interest retained by Dakota, whether it retained a meaningful upside or downside risk.[19] Stated somewhat differently, did Dakota relinquish its reversionary interest in the Semi-tractor under the terms of the Agreement?[20]

---

[17] Dkt. 74, ¶ 8.

[18] *In re HP Distribution, LLP*, 436 B.R. at 686.

[19] *Id.,* 436 B.R. at 690.

[20] *Addison v. Burnett*, 41 Cal. App.4th 1288, 1296, 49 Cal. Rptr.2d 132, 137 (1996).

9

Although the UCC directs courts to examine the "facts of each case," it "does not provide any standard for determining which facts are relevant or how relevant facts should be weighed in the final determination"[21] of whether the lessor retained a meaningful reversionary interest. Instead, UCC § 1-203(c) enumerates six factors which, if present, do not create a security interest "merely because" of their presence.[22] The Court finds that four of the conditions are present and three are not. The second, third, fourth, and sixth factors are respectively shown as follows. The second factor is shown because the Debtor has assumed the risk of loss of the tractor. The third factor appears because the Debtor agreed to pay taxes, insurance, license and registration fees, and all service or maintenance costs. The Debtor has the option to become the owner of the Semi-tractor by paying Dakota $31,100 at the end of the term of the Agreement, demonstrating the fourth

---

[21] *WorldCom Inc. v. General Electric Global Asset Management Services (In re WorldCom, Inc.)*, 339 B.R. 56, 71 (Bankr. S.D.N.Y. 2006) (applying California law).

[22] UCC § 1-203(c) provides:

(c) A transaction in the form of a lease does not create a security interest merely because:

(1) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
(2) the lessee assumes risk of loss of the goods;
(3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;
(4) the lessee has an option to renew the lease or to become the owner of the goods;
(5) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
(6) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

factor. The sixth factor is shown because the fixed price of $31,100 "represents the estimated fair market value of the Equipment as of the date of the" Agreement.[23]

Three of the "merely because" factors, the first, fifth, and seventh, are not present. As the parties have stipulated that "the present value of the lease payments, excluding the security deposit, does not equal or exceed the purchase price of the subject Semi-tractor," the first is not present.[24] Neither is the fifth because Debtor has stipulated that he does not have the option to renew the Agreement.[25] Finally, the seventh factor is absent because the Agreement does not provide for increase or decrease in the rental payments.

How ever many factors appear, White and Summers suggest that these factors were included in the statute to overrule a series of bad decisions under the pre-1987 version of section § 1-207(37) and that generally, with the possible exception of condition (a), which is not present in this case, the factors are not only "not enough" to indicate a security agreement, and are "generally irrelevant."[26] One court has stated that the list "provides no guidance in determining what fact or set of facts would justify the court concluding that an agreement created a security interest."[27]

---

[23] Agreement ¶ 19, Dkt. 74-1, pp. 6-7.

[24] Dkt. 74, ¶ 13.

[25] *Id.*, ¶ 16.

[26] 4 J. White and R. Summers, Uniform Commercial Code §30-3(c)(2) (2009).

[27] *In re WorldCom, Inc.*, 339 B.R. at 71.

11

California case law provides that two features of a lease must be examined in light of the question whether the lessor has relinquished its reversionary interest: "(1) any option to purchase and (2) any provision for the lessee's acquisition of equity in the goods."[28] As to the option to purchase, the Agreement states:

> Provided that the Lease has not been terminated or cancelled and that no default or Event of Default has occurred and is continuing, on the last day of the Term, Lessee shall have the option to purchase the Equipment for a price equal to the following "Purchase Option Price": $31100. Lessor and Lessee acknowledge and agree that such price represents the estimated fair market value of the Equipment as of the date of the Lease.[29]

UCC § 1-203(c)(6) "validates certain fixed price options as clearly consistent with true lease status."[30] It states:

> (c) A transaction in the form of a lease does not create a security interest merely because:
> . . .
> (6) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.[31]

---

[28] *Addison v. Burnett,* 41 Cal. App.4th at 1296, 49 Cal. Rptr.2d at 137.

[29] Agreement ¶ 19, Dkt.74-1, p. 6.

[30] Edwin E. Huddleson, III, Old Wine in New Bottles, 39 Ala. L. Rev. at 633.

[31] UCC § 1-203(c).

12

Case 09-13941    Doc# 85-1    Filed 04/04/11    Page 12 of 18

This "safe harbor defines the classic case where the lessor retains a real, economically meaningful interest in the residual."[32]

In this case, the purchase option is within the safe harbor. The parties have stipulated that the $31,100 payment required by Debtor to become the owner at the end of the lease term represents the estimated fair market value of the Semi-tractor at that time, as determined on the date of the lease.[33] However, a lessor can be found to have not retained a meaningful reversionary interest even though the purchase option is within safe harbor UCC § 1-203(c)(6).[34] The Court therefore considers Debtor's argument that this safe harbor does not control because of the $31,100 security deposit. As to the security deposit, the Agreement provides,

> Any security deposit paid by Lessee . . . shall be held by Lessor to secure payment for potential damages or excessive wear and performance of the obligations of Lessee hereunder. In the event Lessee performs each and every obligation under the terms of his Lease, such security deposit or so much thereof that has not been applied by Lessor shall be returned to Lessee.[35]

Based upon the security deposit provision, Debtor contends at the end of the term, if there were no charges against the deposit, "Dakota would not have a meaningful reversionary

---

[32] Edwin E. Huddleson, III, Old Wine in New Bottles, 39 Ala. L. Rev. at 633.

[33] Dkt. 74, ¶8.

[34] *In re Grubbs Construction Co.*, 319 B.R. at 718 ([T]here is substantial authority that if the 'economic realities' dictate otherwise, the inclusion of a fair market value option . . . does not require the finding that the agreement is a true lease").

[35] Agreement ¶ 5, Dkt. 74-1, p. 2.

13

interest because either way the Debtor would either be paid the value of the semi-tractor [through return of the security deposit] or would have the semi-tractor returned."[36] Debtor cites *Grubbs*[37] and *Kerkle*[38] in support.

This argument ignores the function of a security deposit. The deposit operates to protect Dakota in the event of Debtor's default of his lease obligations, and at the end of the term any remaining balance shall be refunded to Debtor. The security deposit does not operate to negate Dakota's reversionary interest. The calculation of the refund is independent of the purchase option. If Debtor wishes to retain possession of the Semi-tractor at the end of the term, he must pay the purchase option price without regard to the amount of the security deposit refund. If Debtor does not wish to purchase the Semi-tractor, he may return it to Dakota and will also receive his refund. It is only if there are no charges against the security deposit that these transactions are economically neutral or offsetting. The Debtor does not argue, and there is no evidence, that the security deposit was set at the amount of the purchase option because of an expectation that Debtor would exercise the option and there would be no charges against the deposit. *Zerkle*, one of the cases relied upon by the Debtor, finds that refundable security deposits are consistent with

---

[36] Dkt. 78, p. 6.

[37] *In re Grubbs Construction Co.*, 319 B.R. at 698.

[38] *In re Zerkle Trucking Co*, 132 B.R. 316 (Bankr. S.D. Va. 1991).

Case 09-13941   Doc# 85-1   Filed 04/04/11   Page 14 of 18

true leases.[39] *Grubbs*, also cited by the Debtor, does not consider security deposits. Examination of the option to purchase indicates that the Agreement is a true lease.

When considering whether Dakota relinquished it reversionary interest in Semi-tractor, California case law also directs consideration of whether the lessee has acquired an equity in the leased goods.[40] "If a lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the option . . . it suggests that the lessor did not expect the return of the leased goods."[41] As one court explained the test, "In asking whether the lessee has an equity interest, the Court is essentially examining whether the contractual option price was set lower than the predicted FMV of the goods in order to reflect the equity interest in the goods that the lessee had previously accumulated, presumably by paying more in 'rent" than the parties would have agreed to in the absence of an intent to allow the lessee to accumulate such equity."[42]

Debtor relies exclusively upon the security deposit in support of his argument that he has acquired equity in the Semi-tractor. He asserts that the security deposit should be recharacterized as "a potential down payment that could merely become applicable at the

---

[39] *In re Zerkle*, 132 B.R. at 320.

[40] *Addison v. Burnett*, 41 Cal. App.4th at 1296, 49 Cal. Rprt.2d at 137.

[41] *Id.*, *quoting In re Zaleha*, 159 B.R. 581, 585 (Bankr. D. Idaho 1993).

[42] *In re WorldCom, Inc.*, 339 B.R. at 73.

15

tail-end of the Agreement."[43] If the down payment is only "potential," the Debtor has acquired no equity. Debtor stipulated that the security deposit is refundable and that "there is no evidence that the debtor was required to pay a substantial, nonrefundable security deposit."[44] Further, Debtor stipulated that "the present value of the lease payments, excluding the security deposit, does not equal or exceed the purchase price of the subject semi-tractor"[45] and "there is no evidence that the rental payments required by the lease were excessive as compared to typical lease payments."[46] The $31,100 option price set at the commencement of the lease is in the middle of the $20,000 to $40,000 range which Debtor now contends to be the residual value of the Semi-tractor of the end of the lease term. Clearly the evidence precludes the Court from concluding that the only economically sensible option for the Debtor would be to exercise the option at the end of the term. Because the Debtor has not acquired equity in the Semi-tractor, Dakota has retained a meaningful reversionary interest.

For the foregoing reasons, the Court finds that the Agreement is a true lease. The bright line test is not satisfied. The economic realities evidence that Dakota retained a significant reversionary interest in the semi-tractor and Debtor does not have equity in the Semi-tractor.

---

[43] Dkt. 78, p. 5.

[44] Dkt. 74, ¶ 20.

[45] *Id.* ¶ 13.

[46] *Id.* ¶19.

**B. Debtor's obligation to assume or reject the lease.**

Since the 2008 Agreement is a true lease with a five year term and it had not expired as of the date of filing, the Agreement is subject to § 365 of the Code. Pursuant to § 365(d)(2), in a Chapter 13 case, the trustee, may assume or reject an unexpired lease of personal property of the debtor at any time before the confirmation of the plan, but, on request of the lessor, the court "may order the trustee to determine within a specified time whether to assume or reject the such lease or contract." Section 1303 provides that the debtor shall have the rights and powers of the trustee under § 363(d).

Dakota requests in its Motion that Debtor be compelled to assume or reject the Agreement, but states no suggested deadline. The Court therefore ORDERS that Debtor file a pleading electing to assume or reject within 30 days of the docketing of this Memorandum Opinion. Such election, in conjunction with the applicable Code sections, shall determine the rights and obligations of the parties relating to the Agreement and the Semi-tractor. Pursuant to §365(p)(1), if Debtor rejects the Agreement or it is not timely assumed, the Semi-tractor will no longer be property of the estate, and the stay of § 362(a) will be automatically lifted.

**CONCLUSION.**

For the foregoing reasons, the Court finds that the Equipment Lease Agreement between Debtor as lessee and Dakota as lessor whereby Debtor acquired possession of the Semi-tractor is a true lease. The terms of the Agreement do not satisfy the bright line test when a purported lease is a security agreement. The economic realities of the transaction

17

evidence that Dakota retained a significant reversionary interest in the Semi-tractor and Debtor does not have equity in the Semi-tractor.

Dakota Financial, LLC's Motion to Compel Assumption or Rejection of Executory Contract is hereby granted. Within 30 days of the docketing of this Memorandum Opinion, Debtor shall file a pleading stating his intent to assume or reject the Agreement.

###